# United States Court of Appeals
## For the First Circuit

No. 05-1917

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

RALPH V. SAYER; LOLA K. SAYER,

Defendants, Appellants,

FRANKLIN SAVINGS BANK; GILES SIMARD; S.C.A. DE LAC MEGANTIC LAMBTON; CAMP MILLING COMPANY, INC.; FRANK SARGENT; ESTATE OF H. MILTON KEENE, by and through Lola K. Sayer, the only surviving heir; TOWN OF CANTON; ROBERT REISNER; WILES FUNERAL HOMES, INC.; P.A. LESSARD FEED, INC.; ESTATE OF CLARA O. KEENE, by and through Lola K. Sayer, the only surviving heir.

No. 05-1918

UNITED STATES OF AMERICA,

Plaintiff, Appellee,

v.

ROBERT REISNER,

Party-In-Interest, Appellant,

RALPH V. SAYER; LOLA K. SAYER,

Defendants,

FRANKLIN SAVINGS BANK; GILES SIMARD; S.C.A. DE LAC MEGANTIC LAMBTON; CAMP MILLING COMPANY, INC.; FRANK SARGENT; ESTATE OF H. MILTON KEENE, by and through Lola K. Sayer, the only surviving heir; TOWN OF CANTON; WILES FUNERAL HOMES, INC.; P.A. LESSARD FEED, INC.; ESTATE OF CLARA O. KEENE, by and through Lola K. Sayer, the only surviving heir.

```
              APPEALS FROM THE UNITED STATES DISTRICT COURT

                        FOR THE DISTRICT OF MAINE

              [Hon. Gene Carter, Senior U.S. District Judge]
```

Before

Boudin, Chief Judge,

Coffin, Senior Circuit Judge,

and Selya, Circuit Judge.

Anthony P. Shusta II with whom Law Office of Anthony P. Shusta II was on brief for party-in-interest, appellant.
Ralph V. Sayer with whom Lola K. Sayer was on brief, pro se.
Frederick C. Emery, Jr., Assistant United States Attorney, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

June 13, 2006

**BOUDIN, Chief Judge**. Ralph and Lola Sayer owned a farm in Canton, Maine. Between 1973 and 1982, a predecessor to the Farm Service Agency ("the FSA")[1]--a federal government entity--made several loans to the Sayers, taking mortgages on the farm and security interests in their farming equipment, crops, and livestock. In 1985 the Sayers filed for bankruptcy, leading in 1989 to a confirmed plan under Chapter 12 of the Bankruptcy Code, 11 U.S.C. §§ 1201-1231 (2000), in which their debt of about $240,000 to the FSA was reduced to just under $104,000. The government says that this was about the value of the real and personal property on which the FSA held liens.

The Sayers committed to make monthly payments for three years to a trustee who in turn would pay various creditors, and thereafter to make payments themselves directly to creditors; the FSA was to receive $648 per month for 12 years and then reduced payments for an additional period. The Sayers made the required payments to the trustee for the three years (possibly late in some instances) and received a discharge in 1994 or 1995. Thereafter, they failed to pay the FSA and also failed to pay certain real property taxes on the farm to the Town of Canton.

---

[1]The FSA was established as a successor agency to the Farmers Home Administration--the original mortgagee for the Sayers' property--pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 226, 108 Stat 3178, 3214-16.

Under Maine law a mortgage is subordinate to a tax lien on real property, and when the Sayers failed to pay their delinquent taxes, the town foreclosed on the farm on April 30, 1996. Me. Rev. Stat. Ann. tit. 36, §§ 942, 943 (2006). On May 19, 1997, the town sold the property by quitclaim deed to Robert Reisner and his wife for $12,415.48, the amount of taxes due. At this time, according to the government, the property was worth $130,000. By its terms the quitclaim deed conveyed to Reisner whatever interest the town possessed.

On January 23, 2004, the United States brought suit in the federal district court in Maine to foreclose its mortgages, claiming that the Sayers now owed the FSA well over $160,000, with interest continuing to accumulate. Reisner (having become sole owner) was named as a defendant along with the Sayers; he took the position that the FSA's period to redeem the property had passed and it had no interest left to foreclose. The Sayers, initially proceeding pro se, contested the amount that the FSA said they still owed.

After extensive proceedings before a magistrate judge and the district judge, the district court eventually entered a judgment determining that the FSA held valid mortgages and foreclosing the mortgages.[2] Reisner was held to be entitled to a

---

[2]The district court also foreclosed the liens on the pledged personal property. Reisner appears to have no claim to the personal property, and our discussion of the mortgages affects only

priority over the FSA for the $12,415.48 that he had paid to discharge the tax lien. The district court adopted the government's computation of the amount then due from the Sayers, now risen to over $170,000 because of accumulating interest. Both Reisner and the Sayers now appeal.

We begin with Reisner's claim that the district court erred in sustaining the FSA mortgages as against his own title to the farm. Under Maine law a municipality may file a certificate creating a tax lien on real property if an assessed tax is more than eight months overdue. Me. Rev. Stat. Ann. tit. 36, § 942. At the time of the recording of the tax lien certificate in the registry of deeds, the tax collector is required to send notice to the taxpayer and any mortgagee of record. Id. No such notice was sent to the FSA in this case.

Filing the certificate creates a "tax lien mortgage" on the real estate "having priority over all other mortgages, liens, attachments and encumbrances of any nature," and the municipality is given "all the rights usually incident to a mortgagee" save that it cannot take possession "until the right of redemption shall have expired." Me. Rev. Stat. Ann. tit. 36, § 943. The redemption period, during which the real estate can be redeemed by paying

---

the real property that was the subject of the Town of Canton's tax lien.

taxes due (plus interest and costs), lasts 18 months from the filing. Id.

If this amount is not paid within 18 months, the tax lien mortgage "shall be deemed to have been foreclosed and the right of redemption to have expired." Me. Rev. Stat. Ann. tit. 36, § 943. However, the municipal treasurer must notify the taxpayer and mortgagees of record 30 to 45 days before the automatic foreclosure date; if the treasurer is late in providing notice, redemption is allowed within 30 days after untimely notice is provided. Id. The FSA was not given notice by the town prior to the automatic foreclosure date.

Where no redemption occurs within the period prescribed, then--assuming that the statutory procedures have been followed--any interest of the taxpayer and mortgagees is extinguished. Morissette v. Connors, 350 A.2d 332, 333-34 (Me. 1976) (taxpayer); Ocwen Fed. Bank, FSB v. Gile, 777 A.2d 275, 282 & n.14 (Me. 2001) (mortgagee). In this instance, while neither of the required notices of the foreclosure were given to the FSA, the government concedes that by 1999 the FSA did obtain actual knowledge of the tax lien and foreclosure.

In the district court, Reisner argued that the statute directly addresses such a situation by providing:

> After the expiration of the 18-month period for redemption, the mortgagee of record of said real estate or his assignee and the owner of record if the said real estate has not been

> assessed to him or the person claiming under him shall, <u>in the event the notice provided for said mortgagee and said owner has not been given as provided in section 942, have the right to redeem the said real estate within 3 months after receiving actual knowledge of the recording of the tax lien certificate by payment or tender of the amount of the tax lien mortgage</u>, together with interest and costs, and the tax lien mortgage shall then be discharged by the owner thereof in the manner provided.

Me. Rev. Stat. Ann. tit. 36, § 943 (emphasis added).

The government concedes that after the FSA had obtained actual knowledge of the tax lien certificate in 1999, it did not pay or tender the taxes due within three months or at any time thereafter. Instead, the FSA waited several years and then sought in the present case to foreclose its mortgages and other security interests, as if its mortgage interest had never been supplanted by the town's foreclosure and subsequent sale to Reisner--save that the government is willing now to pay Reisner out of the proceeds of its own hoped-for mortgage sale the amount that he paid in taxes.

The government admits that under the Maine statute the town itself had title to the property, subject to the FSA mortgages which would terminate if the FSA gained actual knowledge of the tax lien and failed to redeem the property within three months. But, the government argues, once the town sold to Reisner, the FSA--as a mortgagee who had not gotten the statutory notices--could maintain its mortgages against Reisner without having to comply with the three-month redemption provision, so long as it refunded

to him what he had paid.  The government deems it irrelevant that the town's quitclaim deed explicitly conveyed to Reisner all rights that the town possessed.

There are rare situations where a seller cannot convey all of what he himself possessed, but we do not read the Maine statute as contemplating such an outcome.  Section 943's language appears to cut off after 18 months the redemption rights of mortgagees who learn of foreclosure, even though not properly notified at the outset, <u>unless</u> within three months of receiving actual knowledge they pay or tender the taxes due--upon which "<u>the owner</u> of the tax lien mortgage" shall discharge the tax lien mortgage.  Me. Rev. Stat. Ann. tit. 36, § 943 (emphasis added).

This wording suggests, albeit obliquely, that "the owner" of the tax lien mortgage (or the property if foreclosure occurred), and not merely the "town" as owner, has reciprocal rights to defeat redemption claims by unnotified mortgagees who did not so pay or tender within three months of actual knowledge.  The magistrate judge said that section 943 did not apply because the FSA could not pay or tender the Sayers' taxes to the town, Reisner having already paid them; but the short answer is that the FSA could have paid them to "the owner" (Reisner) and then redeemed--if it did so within three months.

The inferences in Reisner's favor from ordinary practice (the ability to convey what one owns) and from the specific

-8-

reference to "the owner" are reinforced by even more potent arguments from purpose and policy. The town's ability to collect taxes through a foreclosure sale would surely be impaired if the government's position prevailed. Were the tax lien amount close to the value of the property, no reasonable purchaser would be likely to pay anything close to the full taxes due for a property that could, if the value went up, be redeemed by the mortgagee not merely for three months after notice but forever.

Further, once a mortgagee has actual knowledge of the foreclosure, as the FSA did here, it is hard to see why it should not be expected to act within three months, whether the property (and tax lien mortgage) is still in the hands of the town or has passed to an assignee of the mortgage or purchaser of the foreclosed property. It is pure happenstance whether the town still owns or has sold its rights. Conversely, allowing the original mortgagee to wait indefinitely in the latter case does nothing except inflict a perpetual cloud on the title.

The government says that the FSA could not be divested of its mortgage interest without notice of the tax lien or foreclosure. This clearly is so under the Maine statute <u>until</u> the FSA had actual knowledge that the foreclosure had occurred (the FSA's related constitutional argument is addressed below). But it was the government's failure to act within three months <u>after</u> it got actual knowledge that effectively divested its mortgage

interest. Actual knowledge followed by inaction is the mainspring of statutes of limitation, of which section 943's three-month period is an example or surrogate.

The government asserts that the Maine statute was intended solely to establish the rights of municipalities vis-à-vis taxpayers and mortgage holders--not the rights of private purchasers and mortgage holders <u>inter se</u>. But section 943 speaks of redemption rights against "owners," without limiting this to municipal owners. And, as we have already seen, the ability of the town to realize on a tax lien foreclosure is affected by its ability to pass on as full a title as it itself enjoyed.

Finally, the government says that Reisner knew of the FSA mortgages and purchased the property without apprising the FSA of the tax lien filing or the foreclosure; indeed, it says that he did so to assist the Sayers whom he has allowed to continue farming the property ever since. But we are concerned here not with balancing equities but with applying a Maine statute drafted for the generality of cases[3]--a statute that offered the FSA ample opportunity to protect its interests. From the standpoint of Maine

---

[3]<u>See</u> <u>Donaghy</u> v. <u>Leighton</u>, 351 A.2d 125, 128 (Me. 1976) (possible lack of good faith by purchaser of tax foreclosed property irrelevant); <u>compare</u> Me. Rev. Stat. Ann. tit. 36, § 943 (if municipality reconveys foreclosed premises to former owner or successor, rights of other parties claiming pre-foreclosure interests (including mortgagees) "are revived as if the tax lien mortgage had not been foreclosed").

law, the FSA is just another mortgagee who slept on its rights until they disappeared.

The government hints at a separate constitutional argument based on lack of pre-foreclosure notice from the town, citing Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 799 (1983). If the Maine statute failed to provide for prior notice for the mortgagee, a constitutional problem with the statute would arise under existing precedent. But where the statute does require notice and a slip-up occurs, nothing in Mennonite precludes a state from requiring that the unnotified mortgagee act to redeem within three months of receiving actual knowledge.

There is one further loose end. The paragraph of section 943 on which Reisner relies is addressed only to situations where the initial notice of the tax lien is not given to an owner or mortgagee (as required by section 942). The government could have argued that the lack of the second notice in this case, required 30 to 45 days prior to the automatic foreclosure, invalidated the town's (and thus Reisner's) title, and that nothing in the "actual knowledge" proviso of section 943 applies to that invalidation.

Not only does the government fail to make the argument, but the 30- to 45-day notice provision was a later add-on.[4] The

---

[4] See 1973 Me. Laws page no. 660; see also Cummings v. Town of Oakland, 430 A.2d 825, 830 (Me. 1981) (discussing the legislative history of the 1973 amendment), appeal dismissed and cert. denied, 454 U.S. 1134 (1982).

policy of the "actual knowledge" provision applies as easily to the lack of the second notice as to the first.  Indeed, a contrary view would undercut the requirement of action within three months of knowledge.  The failure to reconcile explicitly the two provisions suggests an oversight rather than a desire to create a new loophole in the limited three-month redemption scheme for unnotified mortgagees.

So far we have been concerned only with Reisner's appeal and his rights as a purchaser of the farm as against those of the FSA as a former mortgagee.  The Sayers' appeal, to which we now turn, pits the rights of the FSA as a creditor against the Sayers as borrowers.  That the FSA has lost its mortgage interest in the real property (while retaining its security interest in other property, see note 2, above) does not mean that it has lost its claim against the Sayers for the unpaid balance of what they borrowed plus accrued interest.  The government claimed this amount to total $171,416.01 as of November 2, 2004, with interest continuing to accrue.

The government sought a judgment against the Sayers in this amount, to be increased by further accruing interest, reduced by whatever the foreclosure sale netted the government.  The district judge declared this debt proved, saying that the court would later enter judgment against the Sayers for any portion of the debt not covered by the foreclosure sale.  Although the real

property is not to be foreclosed, the Sayers will still be entitled to such a credit for anything realized in a sale of the farm equipment and other non-real estate assets.

The main thrust of the Sayers' appeal is that they do not owe as much as the government claims, assuming they owe anything, and that they have been denied access to records that would allow them to determine the amount they owe. In the district court, they acted pro se during much of the litigation; in this court, they again appear pro se. On appeal, we can take their terse arguments in the best light possible; but we cannot undo mistakes that they made in the district court. See Eagle Eye Fishing Corp. v. U.S. Dep't of Comm., 20 F.3d 503, 505-07 (1st Cir. 1994).

The Sayers' best claim is that they were denied adequate discovery. The government filed its complaint on January 23, 2004. Under a local rule, the case was assigned to the "administrative track," meaning that discovery required approval by a judicial officer. D. Me. R. 16.1(b)(1). On April 20, 2004, the government moved for summary judgment, attaching a sworn declaration stating the amount owed based on FSA business records and the FSA affiant's "personal knowledge of [the Sayers'] loan account."

The Sayers, then acting pro se, filed a series of motions, seeking a stay of summary judgment to give them time to obtain counsel as well as court-ordered mediation and a court-ordered audit of their loan accounts. The magistrate judge, to

-13-

whom the case had been confided for a recommendation and report, ruled that the amount due from the Sayers could not yet be determined definitively and that the Sayers should have a chance to present evidence to counter the FSA declaration.

The district judge agreed and, on September 15, 2004, the magistrate judge set November 16, 2004, as the discovery deadline. The Sayers then sought from the government (among other documents) a "statement of account" for their FSA loans.  In a telephone conference with the court on October 25, 2004, the government, according to the magistrate judge's report of the conference, "agreed to provide the Sayers with their complete 'statement of account' no later than November 16, 2004."  The report said that this meant

> for purposes of this Order, . . . all documents and information the Government intends to use in support of its claim of amounts due and owing.

On November 16, 2004, the government provided to the Sayers statements of accounts for their two post-bankruptcy loans (one secured by real property and the other by personal property) in the form of two single-page spreadsheets. On December 7, 2004, an attorney entered an appearance for the Sayers and the next day filed a motion to amend the scheduling order. The filing said that the statement of accounts was "inadequate"; that the Sayers' earlier discovery efforts "while perhaps procedurally flawed" gave

the notice of what was sought; and that the discovery deadline should be extended and new discovery allowed.[5]

The government opposed the motion, arguing that the Sayers were engaged in delaying tactics while continuing to farm "property that does not belong to them"; that they had ignored a settlement proposal offered by the government to them the previous month; and that extension of the discovery deadline would prejudice the government because of scheduling problems.  The magistrate judge heard arguments and denied the motion to extend the discovery period to allow the Sayers to make new requests.

While the Sayers were seeking to reopen discovery, the government amended and renewed its motion for summary judgment against them.  The Sayers terminated their counsel and represented themselves in resisting the government's summary judgment motion (although counsel did file a response to the motion on the Sayers' behalf prior to termination).  Eventually, the magistrate judge entered a report and recommendation on the merits in favor of the government and the report and recommendation were adopted by the district court.

The denial of further discovery is perhaps troublesome. The government, although seemingly within the letter of its

---

[5]The Sayers' counsel sought "access to the FHA's complete files, dating back to the bankruptcy filing," so the Sayers "could reconstruct their account history," and requested permission to depose an employee of the FSA's local office "to determine how the funds [the Sayers] paid to FSA were accounted for."

agreement at the October 2004 telephone conference, provided the Sayers on the last possible day with two brief and difficult-to-decipher summaries. The documents were certainly not what the Sayers expected and provided very limited guidance to anyone trying to reconstruct a complicated history of payments. It is enough to say that the government's scheduling concern had some force but probably not very much.

It appears that the Sayers have forfeited any objection to the denial of further discovery. Under District of Maine Local Rule 72.1, a party seeking review of a magistrate judge's order must file any objection to the order with the district court within ten days. See also Fed. R. Civ. P. 72(a); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962, 964-65 (1st Cir. 1997). It does not appear that a timely objection was in fact filed, although the government has not raised this concern and defends the denial of further discovery solely on the merits.

In all events, the regulation of discovery is very much the district court's province and the denial of an extension tested only for abuse of discretion. See In re Public Offering PLE Antitrust Litig., 427 F.3d 49, 52 (1st Cir. 2005). The Sayers chose to conduct their own discovery at the outset, without knowing how to frame their requests to force adequate disclosure, and obtained counsel only after the deadline had passed (terminating counsel not long after).

A trial court asked to extend a previously set discovery deadline is likely to make an intuitive judgment based on a range of factors. One is whether the reason given for needing more time has force but another is whether further discovery is likely to lead anywhere productive. A continuing problem for the Sayers, in this court as much as in the district court, is that we still have no well-grounded basis for suspecting that the government accounts are wrong. Even with counsel, the request proffered for more documents was remarkably general. See note 5, above.

On this record we cannot say that it was an abuse of discretion for the court to refuse to reopen discovery. The government was perhaps ungenerous, even if it believed that the Sayers were stalling; but generosity from an adversary is not an entitlement in litigation. And, given the Sayers' defaults in payment after their prior bankruptcy had reduced the debt by half and some of their kitchen-sink arguments in this case, the government's frustration is not altogether surprising.

The Sayers' other major claim is that they did not owe the full amount stated in the sworn declaration and shown on the government's statement of account. The Sayers take issue with the resulting figure on several specific grounds. Because their claims were rejected on summary judgment we review the issues de novo, Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000), but

find that the district court did not err in its legal rulings and that no issue of material fact requiring a trial was presented.

The Sayers' most fully developed claim as to the figures on appeal is that the bankruptcy trustee used a portion of the amount paid him by the Sayers in the first three years of the plan to pay legal fees to the Sayers' bankruptcy attorney rather than using it to pay other creditors such as the FSA.  It is apparently true that the trustee, in order to pay the Sayers' bankruptcy counsel, persuaded the FSA to accept a deferral of something close to $9,000 of the $23,000 or so it had expected to get in the first three years.

But the Sayers have not offered anything by way of either evidence or argument to show that the trustee's action was impermissible.  Nor do they explain why the delay in paying almost $9,000 owed to the FSA should erase the debt.  They suggest that this delay was the cause of the FSA accelerating their total debt; but, although acceleration occurred, the record shows this occurred several years later--after the Sayers had made no payments of their own to the FSA, as the plan itself required them to do.

The balance of the Sayers' arguments on appeal comprises terse assertions in their brief that this or that action by the FSA was unlawful:  the Sayers say, for example, that they have been denied access to their loan records, administrative review, timely notice of property taxes being past due, and mediation of their

disputes with the FSA.  These claims, and others like them, are generally accompanied by a brief citation to the Code of Federal Regulations or occasionally to a statute.

None of these claims rests upon any developed argument as to either fact or law and the claims are not adequately developed to permit review.  See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998).  We have pursued ourselves (and with as little help from the government as from the Sayers) several of these remaining claims raised on appeal and found ourselves unable to get very far.  If there are any substantial claims amidst the dross, they are well concealed.

The judgment of the district court ordering foreclosure is vacated but only insofar as it includes foreclosure of the real property and the case remanded for dismissal of the government's claim of foreclosure as to the real property.  So far as the judgment declares the gross amount owing to the United States from the Sayers, it is affirmed.  Each party shall bear its own costs.

It is so ordered.